**BOWE et al.**

v.

**COLGATE–PALMOLIVE COMPANY et al.**

No. NA 66–C–20.

United States District Court, S. D. Indiana, New Albany Division.

Dec. 30, 1977.

Marion W. Garnett, Chicago, Ill., John O. Moss, Indianapolis, Ind., James C. Hickey, Ewen, MacKenzie & Peden, Louisville, Ky., for plaintiffs.

Thomas C. Galligan, New York City, Hubert T. Willis, Middleton, Reutlinger & Baird, Louisville, Ky., Richard C. O'Connor, Orbison, Rudy & O'Connor, New Albany, Ind., Jerry D. Anker, Lichtman, Abeles & Anker, Washington, D. C., for defendants.

Charles Reischel, Equal Employment Opportunity Commission, Washington, D. C., Bernard Huff, District Counsel for Equal Employment Opportunity Commission, Indianapolis, Ind., for amicus curiae.

## MEMORANDUM AND ORDER

### AWARDING ATTORNEY FEES AND EXPENSES

STECKLER, Chief Judge.

After more than eleven years, two appeals, 387 docket entries here in the trial court, and 3,984 pages of transcript, this case is now before the Court for the award of attorney fees pursuant to Section 706(k) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(k).

## I. History of the Case.

### A. *The Earlier Decisions.*

The complaint was filed on March 30, 1966, by certain named female employees of the Colgate-Palmolive Company's Jeffersonville, Indiana, plant (Colgate) against the Company and the employees' collective bargaining agent, International Chemical Workers Union, Local No. 15 (Union), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Plaintiffs charged that they were intentionally discriminated against by a system of job classification which deprived them of various job opportunities in the plant and that they were subjected to discriminatory layoffs under the segregated seniority system based on the employees' sex. Many of the relevant facts are set out in this Court's 1967 decision. *Bowe v. Colgate-Palmolive Company,* 272 F.Supp. 332 (S.D.Ind.1967). A reading of that decision and the two decisions on appeal, *Bowe v. Colgate-Palmolive Company,* 416 F.2d 711 (7th Cir. 1969) (*Bowe I*), and *Bowe v. Colgate-Palmolive Company,* 489 F.2d 896 (7th Cir. 1973) (*Bowe II*), will reflect the highly refined, bizzare and extraordinarily complex system of seniority and job assignment in effect at the Jeffersonville, Indiana, plant at the time the suit was filed. A reading of those decisions will also reflect the many legal issues of first impression presented under Title VII of the Civil Rights Act of 1964. The obdurate attitude of counsel and the parties made the whole course of the litigation difficult and time-consuming to handle. The case required numerous conferences between the Court and counsel. To arrange and hold these conferences was often inconvenient inasmuch as counsel were located in Louisville, Kentucky; New Albany, Indiana; Indianapolis, Indiana; Chicago, Illinois; Washington, D.C., and New York City.

Both the Union and Colgate filed cross-claims against each other; however, these were each ordered dismissed as being without merit. The trial of the case commenced September 20, 1966, and consumed seven weeks as well as one week of nonconsecutive days in argument. Judgment was entered for the Union and for Colgate on all issues except as to certain layoffs and back pay. As to these this Court found that discrimination had occurred and awarded damages of approximately $16,000.00 to twelve plaintiffs whose claims were considered properly before the Court. Plaintiffs' initial trial counsel, David L. Gittleman and Daniel B. Burke, were awarded attorney fees in the amount of $12,500.00.

The first decision of this Court was rendered June 30, 1967, although judgment was not entered until September 12, 1967. On July 27, 1967, three of the named plaintiffs, Georgianna Sellers, Lena Moore, and Anna Casey, acting pro se, prematurely filed a notice of appeal. Still acting pro se they filed a second notice of appeal on October 6, 1967. From the quality of the workmanship in the papers filed it was apparent that these plaintiffs were being counseled and represented by undisclosed counsel. Subsequently, it was disclosed that they were being counseled by Washington, D.C. counsel, one of whom was Sylvia S. Ellison (hereinafter referred to as "Ellison") whose role in the case and application for attorney fees will be discussed later.

On July 28, 1967, attorney Marion W. Garnett, Chicago, Illinois (hereinafter referred to as "Garnett"), and attorney John O. Moss, Indianapolis, Indiana (hereinafter referred to as "Moss"), filed notice of appeal on behalf of Thelma Bowe and thirty-one other named female employees. The notice of appeal stated that it was being filed "on their own behalf and on behalf of all female employees of the Colgate-Palmolive Company employed at Jeffersonville, Indiana, on finishing labor jobs." Georgianna Sellers, Lena Moore, and Anna Casey were among those named on whose behalf attorneys Garnett and Moss filed notice of appeal. After the case reached the Court of Appeals, Ellison filed an appearance on behalf of the Sellers group. On August 22, 1967, attorney Jerry D. Anker, Washington, D.C., entered his appearance in the District Court as an additional attorney on behalf of the Union. Due to the then recent enact-

ment of the Civil Rights Act of 1964 and the issues of first impression presented on appeal, the International Union, United Automobile Workers, the National Federation of Business and Professional Women's Clubs, Inc., and the Equal Employment Opportunity Commission were permitted to enter the appeal as amici curiae. In May 1969, the case was first argued on appeal; twelve lawyers were aligned on the side of plaintiffs on one issue or another, either as amici curiae or as appellant counsel. Thus, in awarding attorney fees in this case it is difficult for this Court to measure precisely the value of the services rendered on appeal by counsel for the Bowe group on the one hand, and counsel for the Sellers group on the other.

On the first appeal the members of the plaintiff class were united on all issues. However, when the case was reversed and remanded to this Court for further proceedings a disagreement developed among the plaintiffs on the issues of seniority and transfers. It was then that the members of the class divided into the two groups, the Bowe group represented by attorneys Garnett and Moss, and the Sellers group represented by Ellison.

At the risk of redundancy but to show the complex nature of the proceedings in this litigation for fee fixing purposes, a brief recital of the two decisions of the Court of Appeals will be helpful. The Court of Appeals held that inasmuch as the Union was not charged before the Equal Employment Opportunity Commission as a party in violation of the Civil Rights Act, the Union could not be held liable for any of the damage resulting from discrimination and decided, contrary to this Court's finding, that the seniority system permitting men to bid for jobs plant-wide but restricting women to jobs not requiring lifting more than thirty-five pounds violated the Civil Rights Act and, although Colgate was entitled to retain the 35-pound weight lifting limit as a general guideline for all of its employees, male or female, with respect to job assignments, each employee was to be afforded the opportunity to demonstrate ability to perform more strenuous jobs, and

each employee so demonstrating was to be permitted to bid on and fill a position warranted by his or her seniority.

The case was remanded with directions to grant injunctive relief as would be required to eliminate the discriminatory system and any residual effects. The women discriminatorily laid off were to be compensated and this Court was directed to ascertain the feasibility of computing the damage to those who, while not laid off, were denied the opportunity to bid on higher paying jobs. *Bowe v. Colgate-Palmolive Company*, 416 F.2d 711 (7th Cir. 1969).

On February 25, 1970, this Court issued a preliminary injunction which, among other things, opened all jobs without discrimination on the basis of sex.

The judgment following the first appeal was entered in an order dated May 7, 1971, as modified February 21, 1972. That order required adjustments in seniority of seventeen female employees and required options to be given to each female employee to transfer to new departments where she would be given departmental seniority equal to her seniority in the department from which she transferred. The order required Colgate to set up an "exposure program" whereby women would be given an opportunity to visit and observe operations of various departments, examine job descriptions, and be formally instructed in the nature of the work. The women were to be paid for time spent in the program including overtime rates for overtime. The transfer options were to be exercised within sixty days after completion of the program. Within sixty days after the transfer, the women were to be permitted to return to their former departments and re-assert their positions there.

In addition to the foregoing, the order required that each female employee was to be permitted, within sixty days after completion of the exposure program, to select a secondary department in which she would, for one year, have departmental seniority of July 2, 1965, the effective date of Title VII, or her date-of-employment seniority, if

less. Accordingly, if she were forced out of a department within one year, she was to be permitted to bid on jobs in her secondary department with 1965 seniority. This device was intended to establish parity with those men who had seniority in a secondary department as a result of involuntary transfer within one year.

The judgment of May 7, 1971, as modified February 21, 1972, also awarded back pay to fifty-four women, bringing the total awards to $96,314.94. Thirty-one of the women were allowed compensation for a period of layoff in 1965, following the effective date of Title VII; thirty-two awards represented a differential between the amount received as wages for time worked since the effective date of Title VII and the amount which would have been earned had the system not been discriminatory.

In the case of each female employee, the problem was to determine in some reasonable fashion the highest rate of pay for such jobs as the employee would have bid on and qualified for if a nondiscriminatory seniority scheme had been in existence. Since it was impossible to reconstruct the exact work history of each employee had the system contained no discriminatory element, this Court chose a test period to determine on the basis of experience the jobs each employee would have selected and performed in the absence of discrimination according to her seniority. The test period selected was from the date of March 9, 1970, through May 31, 1970, the twelve weeks beginning shortly after the preliminary injunction opening all jobs to women.

Women who obtained the better paid general labor jobs during the test period were awarded the difference between their actual pay for time worked since July 2, 1965, and an amount computed for the same period on the basis of their individual hourly rate during the test period, less adjustments for contractual increases. They did not, however, receive an upward adjustment in vacation or sick pay, or in the Christmas bonus.

All women who had been laid off in 1965, while men junior to them were retained, received an allowance for that period. Those who did not obtain the higher paying general labor jobs during the test period, or who had ceased to be employed at Colgate, were paid at the higher of two finishing labor rates.

The Sellers group appealed from the judgment of May 7, 1971, as modified February 21, 1972, claiming that the seniority adjustments and job assignment options were inadequate to eliminate the residual effects of the past discriminatory system, and that the back pay awards did not reasonably represent the difference between the amount earned by the women and the amount they would have earned had no discrimination been practiced.

Following the remand on the first appeal, *Bowe v. Colgate-Palmolive Company*, 416 F.2d 711 (7th Cir. 1969) (*Bowe I*), the Bowe group and the Sellers group, as previously indicated, took different stands as to the appropriate remedies to be pursued in regard to seniority adjustments and departmental transfers. The Bowe group was satisfied with the equitable relief granted but not with the back pay adjustments. In the second appeal the Bowe group, as appellees, defended the injunctive relief granted but not the back pay relief. On the second appeal, *Bowe v. Colgate-Palmolive Company*, 489 F.2d 896 (7th Cir. 1973) (*Bowe II*), the Court of Appeals disagreed with the Sellers group and agreed with the Bowe group and with this Court that the seniority adjustments and job assignment options were adequate to eliminate the residual effects of the past discriminatory system but agreed with the Sellers group that the back pay awards did not reasonably represent the difference between the amount earned by the women and the amount they would have earned had no discrimination been practiced. The Court of Appeals ruled that a new test period had to be selected. It ruled that in order to be valid the test period for computation of back pay had to be one in which both current and residual discrimination were no longer in operation. It found that in the test period selected by this Court residual discrimination was still

evident. It found that the test period was not representative for purposes of determining the jobs in which female employees would have been employed had there been no discrimination in the system. It ruled that the presumption existed that female employees who had worked for substantial periods after the effective date of the Civil Rights Act of 1964, and thus had been exposed to discriminatory elements of the employer's job bidding system, and who had resigned or retired before the test period chosen for purposes of computation of back pay awards, had suffered pecuniary loss as a result of discrimination. Finally, as *Bowe II* indicates, it ruled that the award of layoff back pay based on the highest finishing labor rate to women who were not employed during the test period chosen for computation of back pay was unwarranted in so far as it implied that the women would not have chosen better paying jobs if they had had the opportunity.

## B. *Proceedings in this Court Following the Second Remand.*

The mandate following *Bowe II* was entered by the Clerk of the Court of Appeals on November 28, 1973. It was received in the District Court on January 11, 1974. On February 8, 1974, this Court issued a notice of a conference following remand to all parties through counsel of record directing them to appear in the Court's chambers on February 28, 1974. They were directed to be prepared to discuss: (1) the selection and use of a new valid test period, (2) the determination of a new computation of both differential and layoff back pay awards, and (3) means of appropriately adjusting vacation, sick pay, and bonuses. To facilitate a meaningful conference the notice requested counsel to meet for a conference among themselves at a mutually convenient time preceding the conference with the Court. Counsel were told that the Court would expect them to exert every effort to agree upon a resolution of as many as possible of the issues remaining to be resolved pursuant to the mandate of the Court of Appeals.

In compliance with the Court's order, the parties, through counsel (a number of the women were actually present), met with the Court on February 28, 1974. After discussion of the issues remaining to be resolved under the mandate of the Court of Appeals, the following orders were issued from the bench, and later finalized in writing on March 4, 1974:

(1) Compensation in the form of back pay theretofore awarded by this Court was to be paid within thirty days to the appropriate parties;

(2) Counsel for the plaintiffs of each of the separate groups or subclasses were ordered to produce within seven days a list of names of each and every member of the subclass which they represented;

(3) Any discovery motions with regard to "the twenty-three uncompensated class members" mentioned in the Appellate Court's second opinion were to be filed within ten days;

(4) The period of April, May, and June 1972, was fixed as the new test period for the purpose of computing back pay and layoff back pay (this was the second quarter of 1972, a time by which this Court concluded that all current and residual discrimination had been erased);

(5) An upward adjustment of vacation, sick pay, and Christmas bonus was ordered to be made;

(6) Mrs. Lillie Whitman was to have the right to opt for a transfer of department. The defendant and the Union were to have ten days within which to move for modification of this particular order;

(7) Colgate was ordered to produce within ten days a list of the names of the women who had worked for substantial periods after the effective date of Title VII, and thus had been exposed to discriminatory elements of the system, and who had resigned or retired before the test period;

(8) Colgate was ordered to produce within ten days a list of names of the women who had worked for substantial periods after the effective date of Title

VII, and who were laid off prior to the test period and who were not subsequently re-employed during the test period, and

(9) Colgate was ordered to produce within three weeks a list of names of women who the defendant believed came within the category of individuals whose experience during the test period was, on account of illness or some other demonstrable reason, not fairly representative in the application of the test period standards. If Colgate concluded that there were no such women who were not fairly representative through the application of the test period standards, Colgate was to so report.

Much activity took place following the conference and the issuance of the March 4, 1974 order. Compensation in the form of back pay theretofore ordered was paid. As will be related, counsel for the Bowe group and counsel for the Sellers group submitted lists of names of women they each claimed to represent. As to the twenty-three women mentioned in the Court of Appeals opinion, Colgate reported they were laid off over a year and lost their seniority rights. Colgate therefore claimed these twenty-three women were not included as members of the class. Colgate reported these were the twenty-three women employed in the spring of 1964, laid off in the spring of 1965, and never called back to work. The Appellate Court ruled that as of July 2, 1965, the effective date of Title VII, and for a period thereafter, these women had the right to be recalled before others were newly hired to fill jobs for which they were qualified. The Appellate Court concluded, however, that the record on appeal did not support reversal as to these women, and the matter was not further pursued through discovery here in the trial court.

As so often found in class actions involving large numbers of employees and massive personnel records stored in an employer's files, or in data processing banks, plaintiffs' counsel, other than their initial counsel, did not promptly and effectively avail themselves of the discovery rules to gain from Colgate the information necessary to process the claims of the class. The Court found it necessary to urge plaintiffs' counsel to get on with the processes of discovery. More than once the Court urged them to go to Colgate's plant and offices and to avail themselves of the necessary orders to cause Colgate to open its files. The Court found that whenever Colgate was ordered to produce information it would do so, contrary to the often repeated charge of counsel for the Sellers group that Colgate was "dragging its heels." From the Court's vantage point it appeared that the information needed was either so esoteric in nature, or so intricately detailed, that plaintiffs' counsel appeared uncertain as to where to start or what actually to ask for. More effective discovery and production commenced following the Court's order of March 4, 1974.

The Sellers group on March 11, 1974, addressed interrogatories to Colgate seeking the names of male employees classified as "new hires" at any time between April 2, 1965, and April 2, 1966, and the date such males were hired and the period of their employment. Additionally, in their interrogatories, plaintiffs sought to learn the date of recall and period of employment for each male employee who was recalled between April 2, 1965, and April 2, 1966, and whose seniority was less than October 1964. As to each category, Colgate was asked whether such male employees were employed as skilled craftsmen, and if so, in which capacity.

Colgate responded to the interrogatories stating that only three new hires had been employed to the date of its answers, March 28, 1974; that there were no recalls whose seniority was less than October 1964, and that each of the three new hires was employed as a skilled craftsman, two as first class electricians and one as a first class sheet metal man. Each of the men was reported to be employed in the maintenance department.

On March 14, 1974, Colgate filed its response to those portions of the Court's order of March 4, 1974, requiring a response with-

in ten days. Colgate prefaced its response by stating that the effective date of Title VII of the Civil Rights Act of 1964 was July 2, 1965; that the test period fixed by the Court's order of March 4, 1974, was April, May, and June 1972, and that Paragraph 7 of the order provided: "7. The defendant shall produce within ten (10) days a list of names of the women who had worked for substantial periods after the effective date of Title VII, and thus had been exposed to discriminatory elements of the system, and who had resigned or retired before the test period."

Colgate listed thirty-two such women setting forth their plant seniority, the date of separation from employment, and the reason. The earliest date of plant seniority was September 8, 1942, and the most recent date was February 24, 1964. The earliest date of separation was March 1, 1966, and the most recent date was February 1, 1972. Twenty-three of the women had retired and nine had resigned.

Paragraph 8 of the Court's order of March 4, 1974, provided that Colgate produce within ten days a list of names of the women who had worked for substantial periods after the effective date of Title VII, and who were laid off prior to the test period, and who were not subsequently reemployed during the test period. Colgate listed one woman, whose plant seniority was March 30, 1970. Her date of separation was October 30, 1970, and the reason for her separation was that she was laid off.

With respect to the women listed in response to Paragraph 7 of the Court's order of March 4, 1974, those who had worked for substantial periods after the effective date of Title VII, and thus had been exposed to discriminatory elements of the system, and who had resigned or retired before the test period, the Sellers group claimed Colgate's response failed to name seven women who had retired or resigned after the effective date of Title VII. The names and plant seniority of the women were specified. Colgate promptly responded by stating that both the premise and the conclusion of the Sellers group in listing the seven women

claimed to have been omitted from Colgate's list were false. Colgate called attention to the exact wording of Paragraph 7 of the March 4th order. Colgate pointed out that the order specifically referred to women who had resigned or retired *before* the test period, and that the test period commenced on April 1, 1972. Colgate stated that not a single one of the women referred to retired before the test period. Colgate stated the retirement date of each of the women in question was later than the test period. Colgate listed the names, the plant seniority, and remarks concerning five of the seven women named. Two had retired on March 1, 1974, one on May 1, 1973, one on May 1, 1972, and the fifth had been on leave since February 16, 1971, and had applied for retirement. Mrs. Ethel M. Austin, it was claimed, did not work for a substantial period of time after July 2, 1965, and therefore was not covered by Paragraph 7 of the Court's order. Mrs. Tina Blake, it was reported, did not retire or resign. Her services were terminated by the company on October 22, 1971; therefore, she was not covered by Paragraph 7 of the Court's order, so it was stated.

Both the Union and Colgate moved to delete Paragraph 6 from the order giving Lillie Whitman the right to opt for a transfer of department. That paragraph was included in the order because of the informal oral request which counsel for the Sellers group made in the conference of February 28, 1974. The basis for the request was that Mrs. Whitman was absent on leave during the 60-day period when the option to transfer out of Toilet Article Finishing (T.A.F.) jobs was to be exercised. Both Colgate and the Union objected to the manner in which the request and order had been made, that is, without a prior written motion and without evidence as to its impact on the seniority of others, and that the request came more than two years after the 60-day exposure period in which the female employees were given the right to transfer to new departments and new jobs had expired. The Court was reminded that in the conference of February 28, 1974, all parties as well as the Court had agreed that the

seniority issues in the case had been fully resolved, that this Court's resolution of those issues had been affirmed by the Court of Appeals, and that the only remaining issues were those related to back pay. Colgate and the Union pointed out that Mrs. Whitman was only one of thirty-one women on leave of absence during the 60-day period in which the transfer options were to be exercised. They argued, and correctly so, that if Mrs. Whitman were then to be given the right to choose a new department, with all the notice and earlier opportunity either to choose a new department or to raise the issue, all the other women similarly situated could make the same request. Colgate and the Union argued that if this were to occur the entire plant could be seriously disrupted once again; that if Mrs. Whitman were to be given the relief her counsel sought, it would seriously injure the rights of other employees, including other women, employed in the department to which she would transfer. It was argued that if she were to be permitted at that late date to carry her T.A.F. department seniority into a new department, all employees in that department—whether male or female—who had a lesser seniority date would be adversely affected. In the Court's final order Mrs. Whitman's request was not honored, and Paragraph 6 of the Court's order of March 4, 1974, was deleted.

In response to Paragraph 9 of the Court's order of March 4, 1974, Colgate filed a list of thirty-two women who it believed came within the category of individuals whose experience during the test period was, on account of illness or some other reason, not fairly representative in the application of the test period (April, May, and June 1972) standards. Omitted from the list were the names of those women who worked at least nine weeks of the thirteen weeks during the test period, that is, women who were not absent for illness or other reasons more than four weeks. Colgate omitted these names in its belief that nine weeks out of thirteen weeks represented a substantial period as to be fairly representative in the application of the test period standards. No objections were voiced to the use of this

criterion and it was approved by the Court. Subsequently, it was used in the formulae in computing the back pay awards.

Colgate reported that it wished to be both careful and explicit in explaining to and alerting the Court that there were women whose names appeared in the list who were not and would not be entitled to any form of differential back pay because they regularly worked on finishing labor jobs or clerical jobs and did not and had not opted for any general labor jobs (these women were sometimes referred to in argument as the "happy clerks"). This, of course, was in conflict with the Court of Appeals' mandate that in so far as the District Court had refused to grant any or greater back pay relief to any member of the class, the judgment appealed from was reversed and the cause remanded for further proceedings. *Bowe v. Colgate-Palmolive Company*, 489 F.2d 896, 904 (7th Cir. 1973).

Paragraph 2 of the Court's order of March 4, 1974, directed counsel for the plaintiffs of the separate groups to produce within seven days a list of the names of the subclass they represented. This, primarily, was for the benefit of the Court in later fixing attorney fees for the respective counsel. Promptly on March 8, 1974, Moss on behalf of himself and Garnett, representing the Bowe group, submitted a report with a list of 143 names attached. In the report he stated that he and Garnett represented "the class." He stated that he and Garnett represented the 143 members of the class listed on the attached sheet from the date of their appearance in the case on or about July 1967 through and including about February 1971, at which time "other counsel appeared for a subclass of thirty-five (35) persons, and from time to time until on or about July 1971 other counsel appeared for approximately fourteen (14) subclass members." Moss stated that he and Garnett "continued to represent the class and the one hundred seven (107) class members not named in a specific subclass."

Ellison filed a list of names of women whom she claimed to represent. Her report

was stated in a different fashion. She stated that although approximately 175 women were then currently or formerly employed by Colgate, including the named plaintiffs and members of the class represented by them, involved in the action were apparently 100 or more of such women who had not indicated any desire to be represented by counsel. Of the women known to have indicated a preference, she listed fifty-eight who she claimed preferred to have her represent them. (Of the fifty-eight, the Court notes that one Myrtle Evans resigned from her employment on January 27, 1965, more than five months before the effective date of Title VII.) On March 26, 1974, Ellison amended her list by adding two names, Shirley H. Hall and Alice B. Shroyer. By adding the two names, she claimed to represent a total of sixty persons, "including 15 plaintiffs and 45 members of the class with whom she had contracts to act as counsel."

The manner in which these attorneys reported the persons they claimed to represent provoked legal argument between them. Purporting to act on behalf of those members of the class who had not specifically retained counsel to represent them in this action, and on behalf of the Sellers group, Ellison filed a response in which she stated the assertion of Moss and Garnett that they "represented the class" rested on a complete misunderstanding of the nature of a class action. In such an action it is not the attorneys for any select group of named plaintiffs who represent the members of the class; on the contrary, she stated, pointing to Rule 23(a) of the Federal Rules of Civil Procedure, it is the named plaintiffs themselves who represent the members of the class who, although similarly situated, have not elected to retain counsel and prosecute their claims. She called attention to the condition precedent that one or more members of the class may sue or be sued as representative parties on condition that they will fairly and adequately protect the interests of the class, and that a class action shall not be dismissed or compromised without the approval of the Court, and that notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the Court directs. Legally, she argued, Moss and Garnett no more represented the class in their capacity as attorneys for Thelma Bowe, et al. than did she herself in her capacity as attorney for Georgianna Sellers, et al.

Ellison renewed the argument that arose before the Court of Appeals on the second appeal in which Moss and Garnett claimed they represented more than two-thirds of the class, and therefore were entitled to the special privilege of filing a brief after all other parties had filed their briefs, including the Sellers plaintiffs, the Union, and Colgate. She stated that in the Court of Appeals she had moved to strike the brief tendered by Moss and Garnett and that she had pointed out that so far as she knew Moss and Garnett represented no more than seventeen plaintiffs or members of the class. She stated that Moss and Garnett made no response to the motion to strike their brief and that the Seventh Circuit entered an order striking that part of the Bowe group brief relating to the arguments concerning a back pay formula.

Be that as it may, it does not lead to the conclusion that Moss and Garnett represented no more than the interests of seventeen named plaintiffs. Indeed, following their appearance in this case they bore a much heavier responsibility than that urged by Ellison, not only to their "named plaintiffs," but to the women in the class as a whole. In the early phases of the case leading to the injunctive relief that brought about the elimination of the discriminatory practices of Colgate in job assignments and departmental transfers, this Court itself remarked that Garnett was "pulling a heavy oar."

Ellison premised her conclusion that Moss and Garnett represented only seventeen members of the class on the fact that Moss and Garnett filed only a general appearance in the trial court in July 1967, and named only twenty-nine plaintiffs in the notice of appeal from the Court's 1967 judgment. She stated the first notice of appeal from that judgment was filed by plaintiffs Sellers, Moore, and Casey on October 6, 1976,

and at the time of the first appeal the plaintiffs were united on all issues, but after the case was reversed and remanded for further proceedings a disagreement developed between them on the issues pertaining to seniority and transfers. In that disagreement the Sellers group contended that only plant seniority would eliminate the residual effects of the discriminatory actions practiced against the women at Colgate's Jeffersonville, Indiana, plant, while the Bowe group was content to settle for the seniority adjustments and transfer provisions ultimately ordered in the case following affirmance on that issue in the second appeal. Because of the disagreement on these issues, Ellison asserted, twelve named women, previously represented by Moss and Garnett, discharged them and joined the Sellers group, appointing her to represent them. When these twelve women were subtracted from the twenty-nine women named in the Moss and Garnett notice of appeal, Ellison claimed Moss and Garnett represented only seventeen women.

Ellison argued the fact that Garnett and Moss did not represent the class and the 107 class members as claimed was evident from the fact that they did not appeal from the Court's order of May 7, 1971, which, she claimed, "excluded approximately 140 plaintiffs or class members from their right to differential back pay." She pointed out that Garnett and Moss did not challenge the correctness of the "List of Plaintiffs and Class Members Showing Who Represented Them As Counsel and The Remedies Afforded by the Order of the District Court" filed as an appendix to the Sellers brief on the second appeal. In that list, she argued, it was shown that she represented fifteen named plaintiffs receiving $28,100.45, and forty-four other members of the class receiving $17,441.96, and that Garnett and Moss represented seventeen named plaintiffs receiving $31,391.31. She argued that only the Sellers group appealed from this Court's order of May 7, 1971, and, further, that it was on the basis of their theory of the case that the Seventh Circuit concluded that "[e]ach class member should be allowed differential back pay for all time she

worked from the effective date of Title VII until the beginning of the new test period," *Bowe v. Colgate-Palmolive Co. (Bowe II),* 489 F.2d 896, 903–04, and remanded the case to this Court so that it could order this additional relief as well as other relief having to do with the inadequate layoff and differential back pay awards which were made. She claimed the Bowe group and the unrepresented members of the class could properly be described as beneficiaries of the victory achieved by the Sellers group in their capacity as representatives of the class.

There is some merit in this argument so long as it pertains solely to the achievement of the additional layoff and back pay awards and other monetary adjustments. Not to be overlooked, however, is the fact that the Bowe group as appellees did not defend this Court's back pay awards but joined in seeking additional back pay through the appeal. Nor to be overlooked is the considerably greater value of the equitable relief gained through the complete elimination of discrimination in job assignments based on sex. From this standpoint the Sellers group gained nothing on behalf of the class as a whole by reason of the appeal that had not already been achieved. Indeed, in arriving at its equitable decree which, as the Court of Appeals noted, eliminated the residual effects of the past discriminatory system, this Court was more impressed by the practical efforts, professional approach, and judicious attitude displayed by those on behalf of the Bowe group than that displayed by those on behalf of the Sellers group.

Throughout the course of this class litigation the Court held the Bowe group and the Sellers group and their respective counsel equally responsible for the fair and adequate protection of the interests of each member of the entire class.

C. *Shaping Back Pay Relief.*

Following resolution of the class representation questions, the Court was faced with the task of shaping a class-based back pay award which would accurately reflect

the Seventh Circuit's conclusions in *Bowe II.* To that end the following events transpired during the 1974–1976 period.

As previously stated, on February 28, 1974, a conference between the Court and counsel was held at which the various components of the final relief award were discussed. Following that conference the Court issued its March 4, 1974, order which, *inter alia,* adopted April, May, and June 1972 as the test period. However, no determination was made at that time with regard to setting a method for computing the differential back pay due the class members. On March 14, 1974, the Sellers group filed a Motion for the Entry of an Order Establishing Backpay Formulae and Other Relief. In that motion, however, no suggested mathematical formulae were offered; rather, the Sellers group, in a supporting brief filed on April 15, 1974, offered rhetorical formulae for making such computation. In that brief the Sellers group submitted that the differential back pay awards should be based upon the following three principles:

(1) female employees whose work records during the test period established that they made higher earnings in a nondiscriminatory system were entitled to the difference of the average of their higher wages during the test period less what they actually received during the period of discrimination;

(2) female employees who did not earn higher wages during the test period than during the period of discrimination were entitled to the difference of the average rate of all women during the test period less the rates they made during the period of discrimination, and

(3) female employees whose work records during the initial test period established that they would have earned higher rates in a nondiscriminatory system but who were unable to work during the 1972 test period were entitled to at least as much as the rate earned by women with comparable seniority in the second test period who had similarly demonstrated the capacity to improve their wage rates in a nondiscriminatory system.

Defendant Colgate filed objections to the Sellers group's motion on April 10, 1974. Colgate vigorously objected to the Sellers group's suggestion that an upward adjustment in retirement benefits be included in the back pay award, arguing that the equitable doctrine of laches barred such recovery inasmuch as plaintiffs had never, throughout the then eight-year history of the proceedings, raised such matter by pleading or motion. Colgate's strongest objections, though, were directed at the use of class-wide averages in computing differential back pay. Particular stress was laid on the fact that the Seventh Circuit in *Bowe II* stated that this Court was to "devise a method for making a fair and reasonable approximation of the money loss for each individual, with a foundation as adequate as the law requires for an award of damages." 489 F.2d at 903–04. Colgate also introduced the "factoring back" concept at this point; it argued that any award had to be based upon the prevailing wage rate as set by the collective bargaining agreement between Colgate and Local 15 for the years for which relief would be granted and not purely on the basis of the wage scale in effect during the test period. Generally, Colgate objected to the entire approach—as well as nearly every specific proposal—set forth by the Sellers group for the determination of back pay.

With the Sellers group and Colgate clearly at opposite poles on the back pay issue, the matter came on for evidentiary hearing and oral argument on April 16, 1974. The hearing and argument were held on April 16, then recessed and reconvened on April 26, 1974. During those proceedings and over the objection of Colgate, the Equal Employment Opportunity Commission (EEOC) was formally brought into the case in this Court as amicus curiae, the Court's thought being that the expertise of the EEOC in matters such as this could be of benefit in arriving at the final award of back pay. Primarily, the hearing was devoted to an exchange among counsel and the Court as to the various theories regarding the back pay award and the various

components to be included therein. It was at this hearing that Colgate's "happy clerk" argument began to be forcefully stressed. Colgate argued that those women who had not opted for higher paying jobs by the test period should not be awarded any back pay because they were not damaged in any way by reason of discrimination in that they chose to remain on the same job in a non-discriminatory system.

A significant portion of the hearing concerned examination and cross-examination of Donald D. Vascimini, Manager of Employee Relations at Colgate's Jeffersonville plant. His testimony revealed the practical difficulties inherent in arriving at the individual back pay awards as well as the conceptual difficulties in ascertaining the appropriate formula or formulae for use in arriving at the individual awards. By way of a detailed exhibit introduced during Vascimini's testimony and argument of its counsel throughout the hearing, Colgate's position as to the mathematical formulae to be applied in computing the damage awards was elucidated. Generally, as reflected in the arguments of its counsel, Colgate stated that the damages were to be determined by asking, "what is the difference between what the women actually earned and what she would have earned absent discrimination."

Because the Court of Appeals had repeatedly expressed the concept that the experience of a woman during the test period should be reasonably representative for each female for the purpose of determining the job in which she would have been employed had there been no discrimination in the job assignment system, and what she would have earned in the absence of discrimination, Colgate, in proposing its formulae, adopted that concept and considered that if a woman worked nine out of thirteen weeks during the test period, that would be representative in the sense and for the purpose expressed by the Court of Appeals and would be a basis for formulae and calculations to arrive at back pay.

In the exhibits introduced during the Vascimini testimony, Colgate, in effect, proposed a four-part plan for the computation of back pay. The overriding concept put forth by Colgate involved finding an hourly differential rate for an applicable period which rate would be multiplied times the number of hours worked during that period to arrive at the back pay due the employee for that period. The computation of the hourly differential was, of course, the key to arriving at the amount of back pay due; Colgate proposed computing that differential in various ways depending on the work history of the respective employees. For each woman who worked nine or more weeks during the 1972 test period, her average hourly rate for that period would be computed. Due to the bizarre way in which Colgate's labor contract was fashioned it was possible for an employee to earn several different hourly rates during a given time period. Because of yearly increases in the hourly rates for the various jobs at Colgate occasioned by the labor contracts and a voluntary increase by Colgate, the average hourly rates were to be "factored back" in order to arrive at an equitable average hourly rate applicable for each year throughout the entire period of discrimination. Overall, the average hourly rates were to include base pay, a night shift differential, holiday and vacation pay, the number of hours worked, holiday hours, and vacation hours, and would be computed in the following manner:

$$\text{Average hourly rate} = \frac{\text{base pay} + \text{nightshift} + \text{holiday pay} + \text{vacation pay}}{\text{hours worked} + \text{vacation hours} + \text{holiday hours}}$$

The average hourly rate actually earned would then be subtracted from the factored average hourly rate in order to arrive at an hourly differential pay rate.

The second section of Colgate's plan was directed to that group of women who did not work at least nine of the thirteen weeks during the 1972 test period but who did work nine of the thirteen weeks in another test period. Colgate defined "another test period" as being the last thirteen weeks in which a class member worked at least nine weeks commencing on or after August 23, 1971, the effective date of the injunctive relief following the first remand, and end-

ing prior to or during the new test period. The formula used for determining the actual relief due would be the same as outlined above for those class members who did work at least nine of the thirteen weeks in the test period.

For women who did not work at least nine out of thirteen weeks in any test period, Colgate proposed using the same basic formula as outlined above but with the average hourly rate for previous work periods determined on the basis of the average hourly rate paid to women who were employed for at least nine out of thirteen weeks in the 1972 test period. For all three of these groups, Colgate sought to apply its "happy clerk" theory.

The fourth point of the Colgate plan involved calculation of the average hourly rate received for the 1967, 1966, and the last half of 1965. Colgate had, it claimed, insufficient personnel records to accurately determine the average hourly rates for the class members for those years because part of those records had been lost or misplaced, and so Colgate proposed finding the average hourly rates for the class members for 1968 and then factoring those figures back to the three previous years in order to reflect contractual pay increases.

The Colgate position on computation of relief as thus presented was not adopted by the Court, but many of the concepts therein such as the general formula and the factoring back component were eventually adopted by the Court, with minor modifications.

At the conclusion of the hearing the back pay issues were not resolved, but the hearing was helpful to the Court in that the positions of the parties became clear. It also became clear at the hearing that the parties were still far apart in their attempts to arrive at an amicable settlement of the relief issue and that considerable effort would have to be expended before the relief phase of this action could be closed. It should further be noted that in the weeks directly preceding the hearing and during the hearing itself, Ellison assumed the most active role on behalf of the class. At the same time it should be noted that during this period her intransigence on certain issues as well as that of Colgate impeded the expeditious resolution of the controversy.

On May 14, 1974, after having had the benefit of the ideas brought forth in the hearing, the Bowe group filed its proposed formulae for computation of back pay relief. At this point the Court would interject that Garnett was no longer involved in the litigation inasmuch as he had become a Cook County Circuit Judge in Illinois and was thus precluded from active participation as counsel by the Code of Judicial Conduct. He is to be commended for his efforts on behalf of the Bowe group and the class up to that point, and the Court, in arriving at its final fee award, has placed great weight upon the professional judgment exercised by and the practical approach taken by Garnett throughout the course of his participation in the case. Moss, remaining counsel for the Bowe plaintiffs, submitted a three-point plan for computation of back pay.

For those class members who worked during the test period, the Bowe group proposed using the highest rate earned during that period as the basis for determining back pay by stating, "The difference between the several rates worked from July 2, 1965 and the highest rate worked during the test period shall be used to compute the amount of back pay for class members who worked during the test period."

For those class members who did not work during the test period but who were, at that time, still employees of Colgate, the Bowe group recommended averaging the highest rate worked by all class members during the test period as the pay rate to be used to determine the back pay award. The Bowe group referred to that average figure as the "computation rate." The back pay award would then be determined by subtracting the rates actually earned from July 2, 1965, through April 1972 from the computation rate.

For those class members who retired or resigned prior to the test period, the Bowe group proposed the following approach. First, the highest rates at which the class

members worked during the test period would be averaged. The rate(s) at which they actually worked would then be subtracted from the average rate, and the difference would then be applied for the period beginning July 2, 1965, and ending at the time of retirement or resignation.

Additionally, the Bowe group proposed that in cases where the rate at which a class member worked during the period of discrimination was higher than the applicable test period rate, the next highest rate from the rate actually received by such workers during the period of discrimination would serve as the basis for computation of differential back pay.

Thereafter, on May 17, 1974, pursuant to the Court's request at the hearing, the Sellers group filed its eight-point "Formulae for 'Making Whole, in a Pecuniary Fashion,' the Women Victims of Colgate's Discriminatory Practices. . . ." The first point in the Sellers proposal set forth that group's previously discussed method for determining the differential, nondiscriminatory pay rate and then proposed how those differential rates would be applied as against wages actually earned with appropriate consideration given to shift differentials and overtime. A plan for computation of damages for those women who were unlawfully laid off was proposed. Other points in the Sellers plan covered Christmas bonuses for 1965 and 1966 and vacation for women who were laid off after the effective date of Title VII, retirement plan contributions and payouts, interest, and deductions. Thus, with each succeeding submission by the parties, the complexity of the back pay issue became clearer.

Colgate submitted its brief on back pay formulae on June 10, 1974. In that brief Colgate formally advanced, with individual assertions, the formulae it proposed for the computation of damages in the various exhibits supplementing the Vascimini testimony at the April 16 and 26 hearing. In that same brief Colgate also advanced its conceptual and legal objections to the Sellers plan with particular emphasis placed on the "happy clerk" nonvictim issue. Colgate vigorously objected to nearly every proposition contained in the Sellers group's proposal. Additionally, the Colgate brief, in answer to the proposals put forth by the Bowe group, stated the Bowe proposals contained "all of the vices of the proposals of the Sellers group" as well as the additional fact that the Bowe proposals ignored the necessity of making "adjustments for contractual increases" or, in Colgate's words, "factoring back." The Court again notes that throughout its brief, and indeed throughout the course of the back pay proceedings, Colgate continually argued that "[t]he women who regularly work in finishing labor jobs or clerks jobs were not in any sense of the word or the cases 'victims' of discrimination."

Then, on July 8, 1974, the Sellers group filed its reply brief on the back pay issue. The main thrust of that reply brief was directed at the so-called "happy clerk" stance of Colgate. The Sellers group argued for class-wide relief and contended that all of the class members were, in some way, victims of sex discrimination and therefore, under legal authorities, entitled to relief. The Sellers group did, however, in the reply brief, concede the correctness of Colgate's position with regard to "factoring back" in order to reflect changes in the negotiated wage rates. The Sellers group also conceded the correctness of Colgate's position on certain other relatively minor issues, but at this point in the proceedings the parties were still far apart in their overall approaches to the back pay issue.

On August 23, 1974, the EEOC as amicus curiae submitted its memorandum elaborating its views on the appropriate formula(e) and method(s) for the computation of back pay in this action. The EEOC plan covered eight major points. The first of those points concerned computation of the average hourly rate during the test period; it mirrored Colgate's proposal for such computation in every way except one: EEOC offered a corrective factor to be placed in the formula which would accurately reflect

the effect of overtime hours. With that correction, the formula appeared thus:

$$\frac{pay}{hours} = \frac{\text{regular pay} + \text{holiday pay} + \text{vacation pay} + \text{night shift pay}}{\text{regular} + \text{overtime hours} + \text{holiday hours} + \text{vacation hours} - 2\ (\text{overtime premium hours})}.$$

In regard to the problem of the lost employee records for 1965 and 1966, the EEOC argued in favor of assuming that the class members had worked forty hours per week or applying the average weekly hours worked during the test period rather than using the years 1967 and 1968 as Colgate suggested, because the discriminatory system was still in effect in those years.

For those women whose average earnings during the test period were greater than the "E" rate, the letter rate assigned to the lowest paying male job during the period of discrimination, the EEOC proposed using that average rate earned, factored back, as the basis for determining back pay in individual cases. For those women who averaged less than the "E" rate during the test period, the EEOC proposed that the "E" rate be used to provide the basis for back pay. The EEOC proposed that Colgate be allowed to show by clear and convincing evidence that, for a particular class member, the use of the "E" rate would be inequitable.

The EEOC proposals also included detailed breakdowns for the various groups of class members who did not work nine weeks or more during the test period. Use of a grand average rate was proposed for determining the back pay due most of the class members in such categories. In certain cases the EEOC proposed allowing class members who would fit in the "grand average" category to show that their awards should be based on the rate an employee with very similar records averaged during the test period; this was the "comparability" concept. The EEOC memorandum also dealt with taxes, social security, interest, and pension adjustments, with the key focus being the interest factor which would serve to compensate for the higher taxes and social security due for the year when the back pay was finally received than what would have been paid had the presumptively higher rates been paid over the period of discrimination.

On September 18, 1974, the Court received "Colgate Comments on EEOC Memorandum" in which Colgate noted the agreement between it and the EEOC on several points in the case. Throughout the memorandum, Colgate adhered to its earlier positions. Numerous points of disagreement were, however, pointed out in the memorandum. Colgate was opposed to the allowance of proof of exception from certain presumptions in regard to back pay because the evidence in the case had been closed and because to allow such proceedings would indefinitely lengthen the case. Colgate made a technical correction in the EEOC's overtime computation, noting that not all overtime was paid at time and a half.

Colgate was strongly opposed to compensating those class members who earned below the "E" rate at that rate. Colgate continued its argument against awarding "gratuities" to those women who did not opt out of low paying jobs under the new seniority system. Additionally, Colgate stressed the point that interest should be awarded only on the net (after taxes, etc.) amount due from Colgate to the individuals rather than the gross award.

Finally, Colgate vigorously opposed presuming that for the years 1965 and 1966 the class members worked forty hours per week. It noted the absentee rate at the plant, among other factors, as calling for reconstruction of prototypical years rather than the use of off-the-wall presumptions.

A Memorandum of Sellers, et al. in Reply to Colgate's Comments on EEOC's Memorandum was received by the Court on October 8, 1974. In it, the Sellers group argued persuasively in favor of back pay for the entire class and against the Colgate argument of "no gratuities." Particular emphasis was placed on the Seventh Circuit's statement in *Bowe II* that presumptions should be resolved in favor of the class. The memorandum also argued for the use of the grand average rate in cases where there was insubstantial time worked during the test period. This memorandum served

to further highlight the major disagreements among counsel in regard to relief. The memorandum also showed disagreement on certain points, such as additional test periods, and use of the "E" rate, between the Sellers group and the EEOC.

On October 11, 1974, Colgate briefly responded to the Sellers memorandum and again advanced its "no gratuities" point as well as its other damage-related points.

Throughout this period, at the urging of the Court counsel continued to confer and communicate among themselves and with their clients as to the acceptability of the practical results of the various formulae proposed.

### D. The Court's Order and the Agreed Judgment.

On March 27, 1975, this Court entered the Order on Remand for Computation of Back-pay Relief. In that order the Court adopted a workable formula for the fixing of back pay awards to which Colgate and the EEOC had agreed. A Grand Average Rate would be determined pursuant to this formula:

$$\frac{pay}{hours} = \frac{regular\ pay + holiday\ pay + vacation\ pay + nightshift\ pay}{regular + holiday + vacation\ and\ hours\ hours\ over\text{-}time\ hours} \cdot$$

$$-2 \cdot (\text{overtime premium hours at time and one-half} + \text{overtime premium hours at double time}).$$

That rate was to be factored back in order to reflect contract rate increases. Finding that Colgate's argument that because some women would not at that time apply for new positions was insufficient to overcome the mandate of *Bowe II* that each member of the class should be allowed differential back pay and presumptions should be in favor of the class, the Court ruled that the back pay formulae which it adopted would apply to all class members regardless of whether they did or did not seek a better paying position when given an opportunity to do so.

For each woman who worked nine or more weeks during the test period, her av-erage hourly rate would be computed using, in effect, the formula for determination of the Grand Average Rate on an individual basis. If an individual's average rate was higher than the Grand Average, then the individual average would provide the basis for determining differential back pay; otherwise, if her rate was less than the Grand Average, then her back pay would be figured using Grand Average Rate.

In this regard, the Court rejected the EEOC's proposal of using the "E" rate because no connection was found to exist between the rate of compensation a given woman would earn and the rate earned by the lowest paid male. Further, the Court rejected Colgate's proposal that each woman who worked nine or more weeks should be paid at her individual rate regardless of whether it was more or less than the average because that approach assumed that a woman who did not change jobs when finally given the opportunity would not have done so at an earlier time had Colgate not engaged in discriminatory employment practices.

In resolving the manner of computing relief for those class members who had worked less than nine weeks during the new test period, the Court rejected the EEOC's recommendation that said group be divided into two subgroups and concluded that all women who worked less than nine weeks during the test period would be classified with those women who did not work at all during the test period. Women included in this classification would have their relief computed using the Grand Average Rate as their nondiscriminatory rate of pay. The Court completely disregarded the old test period and made all determinations based upon the 1972 test period.

With regard to the misplaced payroll records for 1965 and 1966, the Court rejected Colgate's suggestion that 1967 and 1968 be used as prototypical years. Instead, a forty-hour work week was assumed with the provision that individual plaintiffs or the defendant could demonstrate to the Court that use of such assumption would be grossly inequitable in particular cases.

Defendant was ordered to make all deductions required by law and was given permission to withhold any increase in pension premiums due to higher wage rates. Because interest is awarded for the loss of use of money, the Court ruled that interest was to be paid only on the net back pay award. The Court also required defendant to pay interest on increased contributions to the pension plan. The Court further directed counsel to meet for the purpose of computing the individual awards and to prepare a proposed order specifying the amounts of back pay and other benefits due the individual class members.

From the date of the order of March 27, 1975, counsel met repeatedly in efforts to reach accords on the back pay relief. On May 14, 1975, Colgate reported that its staff had made thousands of calculations indicated by the order in an attempt to generate the figures necessary to comply with the order and even with the assistance of a computer had not completed the calculations. Contentions arose as to how certain factors, such as interest, should be treated in the calculations. For example, Colgate stated its intent to omit from the calculations a forty-two day period in 1966 during which there was a strike at Colgate's plant. Resolution of such contentions contributed to the delay in presenting the individual computations to opposing counsel for their verification and approval and then to the Court.

The complexity of these calculations was such that in order for plaintiffs' counsel to verify them it was necessary to use the services of a mathematician-computer scientist, William E. Brodie.

In December 1975 both plaintiffs' and defendants' counsel reported to the Court that nearly all of the disputes regarding the March 27, 1975, order had been resolved except the matter of overpayment of interest on the earlier awards and whether interest was to be paid on the gross or net amount of the awards paid and to be paid. This was resolved by the Court's ordering that interest was to be paid on the net amounts only.

Finally, more than one year after the March 27, 1975, order, on April 6, 1976, the parties presented and the Court signed an Agreed Order, Judgment and Decree which incorporated an exhibit prepared by the parties, including the computation of relief due the individual class members. The Agreed Order modified the earlier order in certain particulars. A Night Shift Premium Override factor was added which, in final effect, recognized that thirty-seven class members would be eligible for higher awards on the basis that they had worked on the night shift and were thus entitled to a premium therefor as night shift rates were greater than day shift rates. A Sick Pay Adjustment section was added which provided a method for distribution of a sick pay fund agreed to by the parties. The sum of $336,749.70 was awarded in the judgment which, when added to the $96,314.94 awarded in the May 7, 1971, judgment, made the total award to the class the sum of $433,064.64.

## II. Applications for Attorney Fees.

When this matter came before the Court for final argument on the attorney fees question on May 20, 1977, the Court, at the outset of said argument, noted that it would be largely guided by *Waters v. Wisconsin Steel Works of International Harvester*, 502 F.2d 1309 (7th Cir. 1974), in arriving at its conclusions on the applications for the award of attorney fees. The *Waters* decision enumerated eight factors, taken from Disciplinary Rule 2–106 of the American Bar Association Code of Professional Responsibility, which a trial court should consider in awarding reasonable attorney fees to the prevailing party in Title VII litigation pursuant to 42 U.S.C. § 2000e-5(k):

"1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly,

"2) The degree to which participation in the case precludes other employment,

"3) The fee customarily charged in the locality for similar legal service,

"4) The amount involved and the results obtained,

"5) The time limitations imposed by the client or the circumstances,

"6) The nature and length of the professional relationship,

"7) The experience, reputation, and ability of the lawyers, and

"8) Whether the fee is fixed or contingent."

As Judge Swygert noted in the *Waters* opinion, "An analysis by the district court which encompasses the foregoing considerations is most assuredly an analysis well within the bounds of trial court discretion." 502 F.2d at 1322.

On the date of the final argument, the aggregate of the amounts sought was $325,000.00 to $375,000.00. For the Estate of Sylvia S. Ellison, who had died on January 3, 1976, Attorney James C. Hickey, Attorney for her Estate, sought $125,000.00 for between 1,381 and 1,881 hours. On September 8, 1971, Ellison filed a submission of time, in which she claimed 881 hours. As precise figures were not available to be computed for the amount of time expended by Ellison from that date to the time of her death, Attorney Hickey, based upon a review of the record of this case and his own experience in Title VII litigation, estimated that Ellison would have reasonably devoted an additional 500 to 1,000 hours in representing the Sellers group and the plaintiff class. Thus, Attorney Hickey's estimation explains the wide variation in hours claimed for and on behalf of Ellison. Given those figures, the Ellison claim is, in effect, a claim for compensation ranging between $66.45 and $90.50 per hour. Garnett sought between $120,000.00 and $150,000.00 for approximately 1,800 hours of legal services. Those figures translate to between $66.66 and $83.33 per hour. Moss sought between $80,000.00 and $100,000.00 for approximately 1,100 hours work or from $72.72 to $90.90 per hour. Although it is clear that a fee may not be awarded simply on an hours times rate basis, the hourly figures noted above are illustrative of the relative value placed by counsel themselves on the services which they have rendered when time is considered.

The Ellison claim is before the Court in a slightly different posture from the claims of Moss and Garnett. Just prior to the commencement of oral argument on May 20, 1977, it was revealed to the Court at a conference in chambers with counsel that Colgate and the Ellison Estate had arrived at a "settlement" of $65,000.00 with regard to the Ellison fee claim and an additional $5,000.00 for Ellison's expenses. This announcement came as a surprise, both to the Court and to counsel for the Bowe group. Indeed, by innuendo Moss questioned what had transpired between the Louisville lawyers, Willis on behalf of Colgate, and Hickey on behalf of the Ellison Estate. The Court had not been consulted or apprised of the settlement prior to consummation of the agreement between counsel for Colgate and the Ellison Estate, although the Court had encouraged counsel to attempt to arrive at an amicable resolution of the question of attorney fees. For that reason, and because the Court was unable to determine at that time on such short notice whether the $65,000.00 amount plus the $5,000.00 for expenses was fair and reasonable under the circumstances, the Court did not approve the settlement.

On June 6, 1977, the Court received a letter from Willis attached to which was his affidavit stating the course of settlement negotiations between Colgate and the Ellison Estate leading to the settlement. The affidavit was prompted by Willis's desire to relate to the Court and Garnett and Moss how the settlement was reached between Willis and Hickey at Louisville and by his desire that Garnett and Moss and the Court would be comfortable in their minds about the settlement. The affidavit states that in a telephone conversation with Hickey concerning a change in the date of the oral arguments on attorney fees, Willis casually asked Hickey if he had thought of any figure for a possible settlement of the Ellison Estate's claim for attorney fees, and that Hickey said that he had, and mentioned a figure which Willis considered too

high. The affidavit states that after a few minutes conversation about the claim and the work involved in substantiating it and the defense against it, Willis mentioned a figure of $65,000.00, which Hickey accepted subject to the approval of his clients and Willis's client. Willis asserts in his affidavit that there was absolutely no inducement or consideration, tangible or intangible, for the settlement other than that expressed in the receipt and release executed by Hickey, a representative of the Sellers class, and the executrix of Ellison's Estate, except the avoidance of the time, effort, and expenses of preparing for and attending a hearing or hearings on attorney fees. It was further stated that Hickey and Willis had no cases or claims with or against each other or their respective clients and no association at the time of the settlement or since, except the Ellison claim.

That settlement has placed the Court in a difficult position in dealing with the applications for attorney fees by Moss and Garnett. Attorney fees for the various attorneys representing the plaintiffs' class should have a relative bearing, one on the others. However, since the Ellison Estate and Colgate are satisfied with the settlement, even though the Court views the amount as a conservative sum for the services rendered and the results achieved through Ellison's efforts, the Court has no reason to question the good faith of either Willis or Hickey in arriving at the settlement. Therefore, so far as the Court is concerned the settlement is accepted and approved, but it shall not govern the Court's consideration in arriving at fair and reasonable attorney fees for Garnett and Moss, except to the extent of evaluating the contribution of Ellison to the results finally achieved on behalf of the plaintiffs.

■ The arguments of May 20, 1977, put an end to the protracted in-court proceedings in this case. The arguments likewise recapped the efforts of counsel for the Bowe group and supplemented earlier hearings and arguments of November 22, 1971, and June 1, 1972, regarding the matter of attorney fees. The Court's decision on attorney fees is based, factually, on the testimony adduced at the various hearings, the documentary submissions of counsel, argumentative briefs, and the Court's own perceptions as to the relative contributions of counsel throughout the course of this litigation, because:

"[i]n assessing the value of an attorney's services, a court is itself an expert on the question and may make its judgment as to the amount to be awarded from its own knowledge and experience . . . ."

*Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp.*, 341 F.Supp. 1077, 1083 (E.D.Pa.1972).

A. *The Time and Labor Involved. Novelty and Difficulty of Questions Involved, Skill Requisite to Perform Legal Service Properly.*

It is on the first two elements of this factor that Colgate has presented its strongest and most vociferous objections to the applications of Garnett and Moss. In both briefs and in oral argument, Colgate has continually seized upon the fact that Garnett and Moss, and Ellison, as well, have not placed before the Court contemporaneous time logs of the hours they spent on the case, despite the Court's repeated admonitions at various stages of the proceedings that accurate time records would be required of counsel.

■ As noted previously, Moss submits that he has put in some 1,100 hours on this case and that Garnett has spent approximately 1,800 hours. Ellison, according to the final submission of Hickey, counsel for her estate, spent between 1,381 and 1,881 hours on the case. It will be noted that the appearances for all three of these attorneys were filed after the trial proceedings and prior to the appeal, in the case of Garnett and Moss, and on appeal in the case of Ellison. For work through the first appeal, Garnett claimed 966 hours, Moss 372 hours, and Ellison 253 hours. That work, according to the submissions of counsel, included the normal matters which new counsel on appeal would be expected to do as well as

consideration of post-trial proceedings in this Court. The nature of the case, the voluminous record of the trial proceedings, the number and volume of documentary evidence, and the fact that there were five organizations involved in the appeal as amici curiae and thus the positions of those five organizations in addition to the positions of two groups of plaintiffs and a corporate and union defendant to consider obviously required much time. However, the total number of hours submitted by counsel cannot be accepted at face value and have been substantially discounted by reason of the duplicative efforts of plaintiffs' counsel and the Court's view that the estimated hours spent by plaintiffs' counsel appear to be excessive, especially in regard to the number of hours claimed for office work and preparations.

The fact that Title VII was a relatively new statute at the time of the first appeal and that there were few appellate decisions on sex discrimination under Title VII at that time may explain the reason for what may now appear through hindsight to be needless and excessive time spent in office work and preparations. Furthermore, many of the hours claimed may have been justified by the fact that at some point in the proceedings counsel would have to gain an in-depth knowledge of the evidence adduced at trial about the Colgate plant and its labor practices if a viable remedial decree were ever to be sought and achieved. Had counsel not incurred great numbers of hours prior to the first appeal, then it follows that they would have had then to spend many more hours in preparation for the proceedings following the results of the appeals.

Because counsel were located in such places as Chicago, Louisville, Indianapolis, Washington, and New York, and because the Colgate plant was in Jeffersonville, and therefore most of the plaintiff class lived in that area, much time was expended in travel for meetings, conferences, and proceedings. Although that travel time cannot be valued at the same premium that in-court time is valued, it is nevertheless entitled to consideration because it is time an attorney cannot devote to his regular office work.

Due to the distances between counsel and the fact that three attorneys were involved in the first appeal on behalf of the class, it is apparent to the Court that there was considerable duplication of effort on the part of counsel during the first appeal as well as throughout the course of the proceedings. In this particular then, the fees claimed must and shall be scaled down substantially.

■ On balance, the estimated time logged and submitted by Garnett and Moss and on behalf of Ellison is adequate to provide the Court with a sufficient basis for consideration in regard to the time factor for the periods when contemporaneous time logs were not kept. Although precise documentation of time spent in the form of contemporaneous time logs would of course be preferable to the estimations before the Court, the material before the Court, especially when considered in light of the Court's familiarity with the efforts of counsel, substantially establishes that counsel spent hundreds of hours on prosecution of the class claim in the trial and appellate courts as well as in informal negotiating sessions. Furthermore, it should be noted that since the matter of hours alone does not serve as the sole determinant in a fee award request under Title VII, *Waters v. Wisconsin Steel Works of International Harvester,* 502 F.2d 1309, 1322 (7th Cir. 1974), the lack of the utmost precision in this regard does not entirely defeat the application now before the Court.

■ The Court without success attempted to make a qualitative analysis of the number of hours claimed to have been logged by each of the plaintiffs' counsel. The Court attempted to ascertain the number of hours devoted to office work, conferences with clients and other counsel, and court appearances. Because of the manner in which each of the plaintiffs' counsel submitted his or her application for attorney fees, that is, without the submission of contemporaneous time sheets showing the nature of the services rendered and the time

devoted thereto, it was impossible to arrive at an accurate conclusion as to the actual number of hours devoted to any one of the above-mentioned categories of services. For example, in a resume of time spent by Garnett and Moss, filed jointly on June 1, 1972, items such as these appear:

Garnett and Moss, January 1972, Preparation for and Court Appearance, 2 days

\* \* \* \* \* \*

Garnett and Moss, February 1972, Trial (Motion To Modify), Preparation and Court Appearance, 2 days;

Garnett and Moss, Conference, Research and Study With Marion Garnett in Chicago, 10 hours.

By such items the Court was unable to apportion the hours between the respective lawyers or to properly allocate such hours to the type of services rendered. Moreover, since some of the items are logged according to days, there is no way for the Court to determine how many hours were spent.

In an effort to come to some conclusion, however, the Court took all of the applications submitted, including the itemizations as set forth in the applications, along with other supporting data, affidavits, and transcripts, and tried, based on normal experience, to make a breakdown of the total hours claimed. Without attributing accuracy to the breakdown, the results were these: Garnett, 1,562.25 office hours, 227.5 conference hours, and 56 in-court hours; Moss, 712.5 office hours, 294.25 conference hours, 63 in-court hours, and 50 hours in travel; and for Ellison, 653 office hours, 58 conference hours, 140 miscellaneous hours, plus 500 to 1,000 hours based on Hickey's representation. For the work appearing reasonably required to produce the results achieved, the number of hours claimed appear excessive in each category, even granting the lack of accuracy in the Court's manner of allocating the hours to the various types of legal services. Thus, in this case it becomes apparent why the Court cannot base an allowance of attorney fees on hours claimed alone, but, in addition, must, in arriving at what it believes to be fair and reasonable allowances, rely on other factors including those elaborated in the *Waters* decision as well as its own perception of what would constitute reasonable attorney fees for services such as those rendered in this Title VII action.

 Colgate argues that the hours counsel have submitted that they have expended in the controversy over the fee award may not be considered in arriving at a fee award. The Court rejects this argument. By statute, 42 U.S.C. § 2000e-5(k), it is provided that "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs . . .." Thus considered, fees are incident to the relief available to a successful Title VII litigant, and the hours reasonably expended in pursuing such an award are to be accorded the same consideration as hours expended on other parts of the claim.

The second element of this factor is "the novelty and difficulty of the questions involved." As was stated previously, counsel did not have the benefit of a wealth of appellate decisions on sex discrimination during the early stages of this case. Indeed, the *Bowe I* and *II* decisions of the Seventh Circuit are cited hundreds of times in Shepards Federal Citations. The difficulty of many of the questions of law and fact encountered in this case is aptly illustrated by the foregoing discussion concerning the shaping of back pay and relief.

The third element of the first factor is "the skill requisite to perform the legal service properly." As the Court stated at the May 20, 1977, hearing, this is "a rather crucial matter" when it is considered in connection with the raw number of hours claimed; that is, qualitatively, some hours must be weighted more heavily than others dependent upon the legal skills required to perform the task at hand. The skills involved in this case for the lawyers now seeking fees practically run the gamut of professional skills. Counsel were required to sift through a voluminous record in order to prepare an appeal, file briefs and argue on appeals, engage in negotiations with opposing counsel, confer with the great num-

bers of clients composing the plaintiff class, and aid the Court in fashioning appropriate remedies. Inasmuch as a relatively new statute was involved, counsel were required to be creative and imaginative in their various presentations to this Court and to the Court of Appeals.

At the May 20, 1977, argument, the Court noted that when Garnett came into the case the Court was impressed with his apparent knowledge and experience in the field of employment discrimination law and that this gave the Court a "feeling of comfort." The Court also deems Moss skilled in this field of the law, and likewise Ellison.

Additionally, the skill, ability, and competitiveness of defendant's lead counsel, Mr. Hubert T. Willis, are such that plaintiffs' counsel's legal skills were tested to the utmost throughout these proceedings.

### B. *Preclusion of Other Employment.*

This factor seeks to find the degree to which participation in the case precludes other employment. By reason of the complexity of this case and the various proceedings, conferences, etc. held in it, counsel were, from a sheer time perspective, precluded from handling their other affairs, their other litigation, and their other clients as fully as they could have done without being confronted with the responsibilities of handling this litigation.

■ The Court recognizes that in many respects this factor reflects the time element in the first factor and, on that account, will not in effect give double value for the time reasonably spent. There are, however, preclusive effects of protracted litigation such as this on one's law practice which are not reflected in a classic "hours times rate equals fee" equation for which the Court will give credit to plaintiffs' counsel. In this regard the Court notes the testimony of Frederick Anderson, a distinguished member of the Indianapolis bar, on November 22, 1971, wherein he stated that because many of the hours in this case necessarily were consumed in out-of-office or out-of-city business there would be difficulty looking after the office or other clients.

### C. *Fee Customarily Charged.*

■ This factor, "the fee customarily charged in the locality for similar legal services," draws some of its importance to this case from the fact that plaintiffs' counsel are or were from Chicago, Indianapolis, and Washington, D.C., and that the case itself arose in the New Albany Division of the Southern District of Indiana. The Court has concluded that Indianapolis is the relevant "locality" for purposes of this factor because of the fact that all of the court proceedings in this matter took place in Indianapolis.

The real significance of this factor comes into focus when the hearings of November 22, 1971, and June 1, 1972, are considered. At those hearings several distinguished members of the Indianapolis bar testified as expert witnesses on the question of what a reasonable fee would be for the services rendered and results obtained by plaintiffs' counsel at that time. Although much of their testimony must now be discounted on account of succeeding events in the case and changes in the law and legal profession since those hearings, the theories upon which the witnesses based their conclusions and their insight into the business of law practices have not been ignored by the Court. Indeed, testimony of certain witnesses foreshadowed the Seventh Circuit's adoption in *Waters* of the criteria in DR2–106 of the Code of Professional Responsibility as the criteria for determining fee awards under Title VII.

The testimony of Messrs. Alan T. Nolan and Karl J. Stipher and their conclusions as to what a reasonable fee would be were based upon contingent fee concepts. That is to say, those expert witnesses believed the fee should be set by taking a percentage (40% according to the guidelines of the Indianapolis Bar Association then in effect) of the total amount of monetary relief granted to the class. Cross-examination of those witnesses, however, brought out that their ultimate conclusions as to a reasonable fee did not include an assessment of the value

of the injunctive relief which operated prospectively. Mr. Stipher stated that to place a value on the injunctive relief which eliminated residual effects of past discrimination at the Colgate plant would involve speculation or conjecture.

The great bulk of the remainder of the testimony centered upon the experts' opinions as to what a reasonable fee would be in terms of an hourly rate. Although such computation is now overly simplistic in light of *Waters*, the Court notes that the witnesses recommended rates ranging from $10.00 per hour for certain work up to $200–$300 per hour for certain other work. Generally, the expert testimony called for using the rates of between $35.00 and $50.00 per hour with one witness calling for an average of $100.00 per hour.

Neither the hourly rate theory nor the contingent fee theory can control the question now before the Court, but the testimony of the expert witnesses who relied on those theories does serve to provide data for the Court's use in considering this third factor of the *Waters* criteria.

### D. *Amount Involved and Results Obtained.*

The amount involved in this case may, in one sense, be considered to be the total amount of the monetary relief granted to the class by the Court's final judgment of April 6, 1976. In this respect considerable credit must go to Ellison whose efforts on the second appeal are most directly linked to the increased back pay award. Not all of the credit can go to her, however, because the efforts of other counsel at earlier points in the proceedings "opened the door" for Ellison to push the issues upon which she emerged successful in *Bowe II.* Further, her efforts toward establishing the principles upon which the back pay award was increased by almost $337,000.00 does not, in and of itself, entitle her to full credit on a contingency theory for the amount of the increase. Substantial efforts on the parts of other counsel in the case remained to be exerted to bring about the ultimate results achieved in the award of back pay.

The import of this factor becomes somewhat skewed when the prospective injunctive relief granted by the Court is considered. There is no way to place an exact monetary value on the worth of the injunctive relief granted by this Court following the first appeal (in which Moss and Garnett were prominently instrumental). Indeed, as Mr. Karl Stipher noted in his testimony, the Court would be engaging in sheer speculation were it to attempt to assign a dollar value to such matters as the seniority and transfer provisions in the injunctive decree.

Testimony of the same nature but of a different tone was offered by Mr. Henry J. Richardson. Recalling a public housing discrimination case heard in this Court in 1953, he restated this Court's opinion that "no man can measure in terms of dollars and cents the value of rights and benefits of another person as a citizen of the United States." Those words are, of course, as true today as they were then, and inasmuch as this case stands as an important equal employment rights case, the thought behind those words is applicable to the instant controversy.

In this respect then, the Court cannot assign a precise value to the "amount involved" element of this factor and must therefore place added significance on the second element of this factor, "the results obtained." The efforts of all of plaintiffs' counsel in this case resulted in the plaintiff class being extended and insured various job-related rights under Title VII of the Civil Rights Act of 1964 which they did not enjoy before. The injunctive relief issued following the first appeal is perhaps the most significant event in the history of this litigation. As noted previously, the Court believes that the efforts of Garnett and Moss are entitled to special commendation in this respect, and their efforts have been evaluated accordingly. Additionally, the Court also recognizes the substantial contribution of Attorney Jerry Anker, counsel for the Union at that stage of the litigation, in shaping the injunctive relief granted.

**E. *Time Limitations Imposed by the Client or the Circumstances.***

This factor does not rise to the level of much significance in regard to the applications now before the Court. At the May 20, 1977, hearing the Court stated:

"Looking over the record I can't find where there were really any serious time limitations imposed upon counsel by the client. . . . I am sure the clients would have preferred to have had this litigation handled in a much more expeditious manner and disposed of far more quickly . . . , but there are many, many factors that enter into the reason why this litigation has been so extended. So I shall not give a great deal of weight to any time limitations placed upon the attorneys by the clients in this case."

**F. *Nature and Length of the Professional Relationship.***

■ Although the length of relationship between counsel and the class spans quite a long period, this factor is addressed to past dealings and justifies a higher fee in cases where there is a long standing lawyer-client relationship with demonstrated results. Since no evidence has been adduced which shows any such professional relationships, the Court will give no weight to this factor.

**G. *Experience, Reputation, and Ability of the Lawyers.***

Plaintiffs' counsel clearly demonstrated their legal ability by emerging successfully in this complicated civil rights action. The Court is not so familiar with the reputation of counsel in their respective communities except for that of Moss, a member of the local bar of this Court. Moss has a reputation as a strong advocate from a plaintiff's standpoint, particularly in civil rights cases. By way of inference, the Court has concluded that Garnett must have an excellent reputation in his community. His new position as a judge stands as evidence of this conclusion. Likewise Ellison's reputation in her professional community must have been high, considering her post-retirement return to the Department of Labor and her position in women's rights organizations.

With regard to experience, the Court has previously noted that it was impressed with Garnett's knowledge of and experience in Title VII litigation. Likewise Moss had had experience in such litigation, and Ellison's efforts are indicative of her experience in working as a government lawyer in the employment discrimination field.

With respect to this factor the Court has noted Colgate's argument regarding the relatively low (in comparison to the fees sought) law office annual income from Garnett's and Moss's law practice, but the Court likewise recognizes that if Moss and Garnett had been paid currently during the years in which they performed services in this case their annual income would have been higher.

**H. *Fixed or Contingent Fee.***

There is no evidence before the Court that plaintiffs' counsel had entered into any fixed fee arrangements with their respective clients. Moreover, there is no evidence before the Court of any percentage agreements between counsel and plaintiffs. It is thus apparent that counsel looked to the fee provision of Title VII for their professional fees in this case.

■ Taking all the foregoing into consideration, the Court concludes that an award of Eighty Thousand Dollars ($80,-000.00) in attorney fees for the combined services of Garnett and Moss would be reasonable, the said sum to be apportioned, Forty-eight Thousand Dollars ($48,000.00) to Marion W. Garnett and Thirty-two Thousand Dollars ($32,000.00) to John O. Moss.

The Court recognizes that to these counsel the amount of the fees awarded may appear to be ultra conservative, but the Court has borne in mind that in awarding attorney fees the Court is required to fix reasonable attorney fees in one sum to be apportioned to the participating attorneys according to their contributions to the successful outcome of the plaintiffs' class action under Title VII. Here the total amount of attorney fees awarded, including

the $12,500.00 awarded Attorneys Gittleman and Burke, amounts to $157,500.00.

### III. *Claims for Reimbursement of Expenses.*

In addition to their applications for attorney fees, counsel are asking for reimbursement of expenses incurred in prosecuting the plaintiffs' Title VII claim. Garnett seeks a $5,923.50 reimbursement while Moss seeks $1,105.40 for out-of-pocket expenses and $7,500.00 for the services of William E. Brodie, the mathematician and computer scientist at Indiana University whose services were engaged for the purpose of computing and verifying the formulae and mathematical results of the data used in arriving at the individual back pay awards.

From the records before the Court the Court is aware of the thousands of mathematical computations that had to be made in applying the mathematical equations in arriving at the net back pay awards to be paid the members of the class. Only a mathematician steeped in the esoterics of the computer sciences could take Colgate's mathematical computer print-outs and either verify or recompute the results therein in accordance with the formulae under the Court's order.

The Ellison Estate, which had submitted a petition for the reimbursement of $5,947.99 in expenses, accepted $5,000.00 for her out-of-pocket expenses as that part of Colgate's settlement of her estate's claim for attorney fees and expenses.

Generally, Colgate has objected to the claims for costs and expenses of each of the plaintiff class's attorneys on the grounds that they are not supported by adequate documentation. To the contrary, while the itemizations presented by Garnett and Moss were not strictly kept as the Court had cautioned at various stages of the proceedings, nevertheless the Court finds that supporting documentary proof as submitted is sufficient to enable the Court to find that their claims should be allowed in full, except that part of the request for the services of Mr. Brodie. For his services the Court has concluded that a reasonable

fee should not exceed $3,500.00, which amount is to be ordered paid.